I'm pleased to welcome again today as yesterday our colleague, Judge Ronald Clark, district judge from the Eastern District of Texas, who obviously is a member of this panel and was a member of the panel yesterday. He appears here doing some extra work out of his generosity and dedication. We appreciate his willingness to do that. As many of you may know, he follows a line of about 40 district judges who have sat with us virtually every argument week since September of 2006. Judge Clark, thank you and welcome. The panel has before it a total of six cases. I just want to announce that three of them will be submitted without argument on the briefs today, namely Staniszek v. United States Postal Service, Appeal 3131, Simonson v. Department of Veterans Affairs, Appeal 7061, and Dumont v. United States, Appeal 5060. On our three-case argument list, we'll hear argument first in Prometheus Laboratories v. Mayo Collaborative. That's Appeal 1403 from 2008. Mr. Bress, good morning to you. Welcome back to the court. Please proceed. I might advise counsel that we've agreed to be a little bit lenient with the red light. In any event, we'll add five minutes to the normal argument time so you can each be assured of having 20 minutes. If necessary, we may even extend that on the spot. Please proceed. Good morning, Chief Judge Michel. May it please the court. There are many different ways to think about this case, all involving machines and transformations of matter, but perhaps the easiest one is that if a process is otherwise statutory, it likewise presents statutory subject matter when additional steps are added to it, particularly when those additional steps are fine or otherwise improve the process. What are the additional steps here? I count two steps. In this case, Your Honor, the initial step is the administration of diatribial drugs to a patient's body to treat that patient for various GI and non-GI autoimmune diseases. That step is plainly a statutory step. What do you mean non-GI diseases? It looked to me like the claims were limited to using those drugs and the metabolites they create and so on to treat GI diseases of a particular sort, those that are immune-mediated. Your Honor, most of the claims are directed towards immune-mediated diseases that are IB-related, inflammatory bowel diseases. Claim 22, for example, of the 623 patent is directed also to non-IBD, non-IB autoimmune diseases. It doesn't cover all diseases, Your Honor. It certainly doesn't cover the use of fire-curing for leukemia, for example, or to treat patients that have received transplants. Let me straighten out something about claims. There's something like 80 or more claims in the two patents asserted, and I had trouble finding out which claims specifically were asserted. Can you help me on that? Initially, Your Honor, we asserted claims 1 of the 623 patent and claim 7. These are both independent claims of the 302 patent, and the district court found summary judgment for us on literal infringement based on claim 7 of the 302 patent. At that point, Mayo moved for summary judgment, and they moved for summary judgment on more claims than that. Indeed, I believe it's fair to say they moved for summary judgment on all of the claims. All 80-some claims? That's how I read the record, Your Honor. And how about the ruling? Did the trial judge deal with all 80-some claims? Certainly not, Your Honor, and it's one of the difficulties we've got with reading the district judge's opinion, is that the district judge dealt primarily with one or two independent claims, and then only in passing referred to dependent claims that related to the use of HPLC. Well, we have enough trouble with this 101 issue. Which claims are we dealing with with respect to the 101 issue? Claims 1 of each patent? Your Honor, in our view, the district judge did not address specifically enough the dependent claims of either of the patents, and really only focused on claim 1 of the first patent and claim 7 of the 302 patent. We have no specific identification in the final judgment or the summary judgment order of exactly what claims were invalidated? Your Honor, I believe that the district judge intended to invalidate all of the claims in both patents. He just didn't identify them by name, and he didn't deal with them specifically in his opinion. Were they all asserted? No, they had not all been asserted, Your Honor. Are there counterclaims? There are no counterclaims, Your Honor. Well, how do we get an invalidity ruling that extends to dozens of claims that were not even asserted in the absence of a counterclaim of invalidity? Your Honor, in this case, our complaint asserted infringement of both patents, and the complaint itself didn't identify which claims were the patents. I noticed this. Yes. Was it ever narrowed later? Was there ever any identification in the summary judgment papers or infringement contingents or anything of that sort that identified which of these 80-some claims were actually being asserted? Yes, Your Honor. We asserted claim 1 of the 623 patent and claim 7 of the 302 patent had been infringed, and the district court held that claim 7 of the 302 patent had been literally infringed. At that point, Mayo sought summary judgment, and they sought summary judgment. But the summary judgment just addresses your infringement complaint. At this point, there's no cross- Precisely. Complaint for invalidity. That's right, Your Honor. But then how do we get a ruling on invalidity as to all these other claims that are not being asserted? Your Honor, I'm as confused as you are about that. I think the district court overreached in addressing claims that had not been asserted by us as infringement claims, but certainly his ruling, I think, is probably best read to cover all of the claims, and I think that that's what he was intending to do. I don't think that that was appropriate. Well, let's get to the 101 question. I'm thinking in terms of treating blood pressure by administering a hypertensive drug. It clearly accomplishes a transformation, and you administer an antibiotic. It affects the body. Administering a drug providing thioguanine, that is an information-generating step, or is it equivalent to treating blood pressure? Administering a drug, accomplishing a transformation. Your Honor, it does both. You administer the drug, not in order to provide you information for later. You're administering the drug for the purpose of treating the patient. Then why isn't this cast as a method of treatment? Maybe it lacks novelty, or maybe it's obvious. Well, if it lacks novelty or is obvious, Your Honor, those are certainly things that we're prepared to address. But that's not before us. That's, of course, not before this court, and by the way, we do believe that we've got good defenses against both of those. It is couched, however, if you look at the preamble. I'm sorry, Your Honor. Let me ask you. You raised the one claim that might be a little different than the treatment, but it does seem. Show me why these patents don't simply claim every possible way of administering any kind of drug that the body might naturally metabolize into 6TG and then use any kind of test which anybody might ever develop to measure the 6TG to assure that it's in some kind of efficacious or therapeutic range. And that range, of course, is determined by the natural processes of the human body. How are you not, in effect, taking over the entire scope of anything either now or forever under 101 that might have anything to do with 6TG? And now you're telling us, one of the amicus briefs said it's only limited to treatment of these intestinal diseases, but now you've just said, I think, oh, a whole claim, what, 22, covers a whole other broad except perhaps leukemia? I mean, aren't you almost digging a hole for yourself with that argument? Well, Your Honor, it's a fact, not an argument, I guess I'd say, and I felt that I've got to let you know what it claims and what it doesn't claim. I don't think that I'm digging a hole, at least I hope I'm not, Your Honor. I do think that this case is quite different from cases where this court has held that a patent was simply too abstract and tried to cover an abstract idea or a law of nature. You know, if you look at those cases, if you look at Graham's, if you look at Meyer, those are cases where what was really attempted was to get a patent on an abstract construct. Yeah, but Judge Hart's question doesn't focus on abstractness, it focuses on breadth. He's saying it doesn't just cover anything that, once administered, metabolizes into 6TG. Yes, Your Honor, it does cover any drugs that, when they're administered, metabolize into 6TG. That's not, of course, an infinite number of compounds. There are thyroid-curing drugs, particularly AZA is the most popular drug used for that. It's probably quite a narrow range of drugs. It's quite a narrow range of drugs. About how many drugs result in metabolization into 6TG? Well, they're all thyroid-curing-based, Your Honor. Okay, but that just tells me that they're all from the same family. It doesn't give me any clue at all whether it's 2 or 20 or 200 or 1,000 or what. Well, the ones that are used and the ones that we named, for instance, in our dependent claims, Your Honor, I think number only 4 or 5. And, you know, I can't tell you that I know offhand are there others that could be invented later. Let me ask you another question about numbers. The claim terms talk about immune-mediated gastrointestinal disorders. How many diseases are we talking about that are gastrointestinal disorders that have that relationship to the immune system? Well, Your Honor, we lay out in the specifications the ones that we've identified at this point. I don't know what the number is. I can bend down and look it over if you'd like right now, but I don't know the exact number that are in these specifications. Give me a rough approximation to try to get some sense of proportion here. Look, my sense from reading this, Your Honor, is you're probably talking about 10 to 15 autoimmune diseases that are IV-related, maybe 10. And then of non-IV, I don't know precisely. Probably a matter of definition. It probably is a matter of definition. But these are, to be clear, we are talking about a defined family of drugs creating a particular artificial metabolite. We're not talking about all drugs that create any metabolite. I think that this case would be much more similar to the cases that this Court has thrown out. If our process were administer a drug useful for treatment because it creates metabolites, measure resulting metabolites, and determine what level of metabolites would be efficacious. How do you get around grams? Your Honor, I think on precisely these grounds. I look at grams, Your Honor, which was an attempt to really patent the concept of diagnosis. Well, it's a method comprising performing a plurality of clinical laboratory tests, which is what you're doing here, and then a bunch of algorithms. Yes. An algorithm, and this Court decided that it was disqualified on the algorithm grounds. Your Honor, I think it's all about particularity. I think that in that case, what we're really talking about is a construct or protocol for diagnosis generally. It didn't identify for what particular abnormal condition. It didn't identify the particular data that you would gather. It just said, well, for any abnormal condition that you're trying to identify, this would be a protocol that you would go through. That's a very abstract concept. This case is much more like arrhythmia and much more like a ballet in the sense that you're talking about solving a particular medical problem or diagnosing a particular medical problem, just like in arrhythmia. The algorithm was used in that case on the results you got from the electrocardiograph test in order to identify whether the patient had a particular chance of having a heart problem. Let me ask you to focus in on the machine or transformation test. What, and then, because part of what I think Driscoll says is the transformation must be significant. It can't just be something extra or minor. So what is significant about, first of all, what is the transformation you're claiming? I take it you're not going to the machine part. So what's the transformation you're claiming and what's significant or central to the process? Because no particular test is identified as near as I can tell in the claims. It's just any test that measures this. So where is the central part of your transformation? Your Honor, let me just preface this with noting that we are relying as well on the composition of matter, tied to a composition of matter which is related, we think, to the machine or transformation test. But putting that to the side for the moment, because I didn't want you to feel like I was saying that. Are you saying that somehow the patent is claiming a new composition of matter? No, not a new one, Your Honor. And of course it doesn't matter under Bilski and under Deere, et cetera, whether it's new, whether that particular machine is new or the composition is new. Our point is only that just as Bilski stated that a process can be patentable subject matter if it is tied to a machine, as we pointed out in our briefs, machines aren't a special statutory favorite among the statutory subject matter and that a tie to a composition of matter similarly can tether a claim in a way that Bilski is trying to do it. I mean, Bilski really is intending to make sure. You're looking, there was, I think, one of the concurrences that went into that in some detail. Right, and you talked about it as well, Your Honor. Right, but get back to where is the transformation that's significant if you're relying on that at all? We're relying on it quite heavily, Your Honor, and I think there's a number of transformations that are significant. First of all, if you look at a macro level, this entire process is about optimizing the process by which thiopurine drugs are administered to create metabolites that then suppress the immune systems. So you're saying the creation of the metabolite by the administration of the thiopurine is a transformation. That is very central to this process because the process is all about better calibrating that. It's a thioguanine-producing drug which can include thioguanine. Yes, Your Honor. Now, what's the transformation there because it affects the IBF, IBD? Well, technically, Your Honor, what happens is even when you administer thioguanine, it turns into thioguanine nucleotides, which are then the active ingredient for purposes of suppressing the immune system. This is laid out in the specifications. So even in that instance, you've got it. And certainly if you're talking about ATA, for example, which is a prodrug that then turns into thioguanine, which then turns into 6TG as well as 6- You're saying that any time you administer a drug to the body, there's a transformation? Well, perhaps not, Your Honor. There may be some drugs that act on the body- That go right through. That go right through and act directly. But when you're talking about an artificial- That go right through and don't act at all. Well, yes, Your Honor. And here you've got drugs that by their very nature, the reason you use them is that they create new substances, metabolites in the body. That's what then treats the disease. The 6TG, even if you put that in, will still turn into 6MMT, which is a different metabolite that's used in this process. In other words, by definition, any drug that's administered and either attaches itself to a receptor or breaks a cell wall of a bacterium or is metabolized affects a transformation. That's right, Your Honor. And that's not inconsistent with this Court's precedent. This Court has seen a lot of patents on methods of treatment which are administering an effective amount of drug X in order to do Y. How do we know that this patent is directed toward optimizing safe and efficacious dosage? Your Honor, we know that best, I believe, by looking at the preamble. Well, that's where I have a little bit of a problem. As I understand it, you argued in the District Court, not you personally, but your side argued in the… Well, you don't have any choice about that. You're stumped over there. But it was argued in the District Court by Prometheus that the preamble did not contain a limitation and that all the limitations were in the body of the claim. And as I understand your brief, here you're saying, well, actually, the preamble is important and it does have to be read in conjunction with the steps in what I'm calling the body of the claim. Is it your argument here that we can and should look at the preamble? Yes, Your Honor, and I don't think we argued otherwise below. The argument below was whether the preamble meant that in every case, if the metabolite levels were over 400 or over 7,000, depending on the metabolite, you had to decrease the dose, or in every case where 6TG was below 230, you have to increase the dose. And we explained in the District Court, and we are happy to explain here, that we don't require for practice of these claims that an actual change in dose occur. The doctor, of course, will. That's on another issue. I'm trying to figure out what position you took with the district judge. When I look at the contentions presented in the context of the summary judgment motions, as I recall, the document shows that under the preamble, the only operative words were a method. That's what the chart suggests. So if I put myself in the district judge, the translation to me is, they're telling me that nothing in this preamble matters other than to identify it as a method claim rather than a structure claim. Your Honor, I saw that chart as well. I don't think that that's what it is intended to imply. Well, is there something in the briefing that would have fairly advised the district judge that he was to read the whole preamble as if it was in the body of the claim? The briefing certainly described the claim in terms of the preamble, as these are claims about optimizing the therapeutic efficacy of these drugs.  Isn't the preamble almost a duplicate of the Waring Clause? Well, I think the preamble is necessary to give life, in other words, to the Waring Clause. This Court has used that terminology, I think, in the Griffin case and in Catalina as well. Many times. Many times. Thank you, Your Honor. And I think that it's only fair to read it in that light in order to better understand what we're talking about. And I also don't think you can read the specifications here without understanding what these claims are about. These are not methods in the abstract with no point to them. These are methods for ensuring therapeutic efficacy or reducing toxicity. Well, the other side argues, if I recall correctly, that your position in the district court was that there were no limitations on the asserted claims other than the two steps set out in the body of the claim we're discussing. Is that right or not? I don't believe that we ever said in the district court, Your Honor, that the preamble's information, that this test is for optimizing therapeutic efficacy or reducing toxicity, is not what we're claiming that this is about and all that's about it. In fact, that's what I'm saying, Your Honor. If what you're saying means we always made it clear to the district judge that this was the context, that's not responsive. I'm asking whether it was an actual limitation. I believe that it was, Your Honor. And you think it was presented as a limitation to the district judge? I don't know that. I don't, and I can't tell you here, Your Honor, that it was presented in terms of an additional limitation of the patent is X. But I do believe it was litigated in a way that the court had to understand that that was the only context in which these patents would operate. In other words, even with respect to Dr. Ellis- It's not a question of context. It's a question of what would infringe. If it's a limitation, the class of methods that might infringe would be much smaller. If it's not a limitation, then the class of methods that would infringe is much larger and perhaps prohibitively larger. I believe the district court could not have been left in any doubt that it was a limitation in that sense, Your Honor. And even with respect to Dr. Ellis-Ari, who's taken up a lot of space in this brief. If that's true, then why do we see in the briefs this discussion about your client charging a doctor, a dermatologist, with violation or infringement? Maybe I missed it in the patent specification. I didn't think about dermatology, but evidently, and although that is kind of, I'll grant you, a rabbit trail or a side issue, still, if that's indicated- I'd love to address that, Your Honor. In fact, just about to hit that. So, yes. First of all, the particular dermatological condition there is one of the non-IV autoimmune conditions that's pointed out in dependent claims. But 22 covers everything, other than maybe one thing that you don't like- Well, there's only certain diseases that can accurately be described as immune-mediated diseases. So, I do think that it doesn't cover everything in the entire world. It's not like RAMS, where you'd say diagnosing any condition that exists. It's like saying there are drugs that, if there were a drug treatment, for example, that would work for any kind of cancer, I think it would be fair to say this works on all cancers. Cancer research may turn out that that's some kind of immune problem, and then you do cover all cancers. Well, all I can tell you here, Your Honor, is the only cancer that I've seen here is leukemia, and we're not covering it. Let me address your point about Dr. Elizari, because I'd like to go to that. Our claim there, of course, was not a claim against the doctor. Just to clarify, our claim has always been against Mayo, and there it was inducing the doctor's direct infringement. So, that's where the doctor- You needed direct infringement for the claim. You always needed direct infringement, yes. But the defendant wasn't the doctor. The defendant was never the doctor. That's not what's important. It's not exactly the defendant. He's a dermatologist, and you're saying, okay, you're measuring 6TG, therefore you're infringing. Well, that's what I'd like to address. The claim has never been that a researcher can't come in after the fact and look at a bunch of cold data and think about these correlations, or otherwise they infringe our patent. When you've got a doctor like Dr. Elizari, who was administering the drugs not for fun and not purely for research, but actually to treat patients that had certain autoimmune diseases, sent the bodily samples to the Mayo lab, which tested for the presence of these 6TG metabolites, and sent back a warning that said that the results are not within the therapeutic range. At that point, the doctor did practice one of our dependent claims in the case, and that's how the doctor was involved. And you're talking about, again, administration of specific and particular drugs to treat specific diseases, measurement of specific metabolites. The transformations include not only that broad transformation. Then you just told the chief judge that the preamble was supposed to be read as a limitation, and you just told me right now, ignore it, because the preamble says, immune-mediated gastrointestinal disorders, such as inflammatory bowel disease. But now you're saying, oh, no, when the dermatologist is doing it, we'll include that also, so we'll read that limitation out. That's a different preamble. If you look to the preamble of 22, it says a method of optimizing... I'm sorry, I thought you were talking about the abstract. You're talking about just straight on... Just straight on the preamble. No, I'm not getting as abstract as the abstract. Okay. If you look at the preamble to 22, it says, a method of optimizing therapeutic efficacy of treatment of non-IBD autoimmune disease comprising... And then it goes into the administration, the determining and the warning stats. Now, if it's correct to characterize the essence of your argument as depending on specificity, in contrast with Graham's, which was highly generalized and lacked any significant specificity, how can we employ the concept of specificity in a manner that will yield predictable, consistent results over a range of different fact situations? It seems awfully vague and subjective to say, well, in this case, there's sufficient specificity, but in this other case, it falls on the other side of the line. The specificity is insufficient. How are we going to be able to measure or discern which side of the line it falls on with such a vague concept as specificity? Your Honor, I agree that at the margins, any of these tests are going to be hard. I mean, this court in Bilski contrasted Benson on the one hand and Deere on the other by saying that Deere was a plainly concrete, highly corporeal process on the one hand, and Benson was an abstract construct on the other. And it really is in that context that I'm making a distinction, Your Honor. And yes, I agree that at the edges, that gets difficult, but if you want to talk about concrete and highly corporeal, these tests easily meet that standard. These claims do. Again, we're not talking about all diseases or any malfunction. If you're myogrammed, you're talking about anything that might go wrong with any system. We're talking about particular autoimmune diseases treated with particular drugs in particular ways, measured according to only the amount per red blood cell, which is a particular form of measurement, with very particular warning at the end based on a particular correlation. I hate to use the word particular so many times, and I could use it, but this court has used it. Let me ask you a different question. If the toxicity range starts at 400, that's toxicity arising from 6TG? Yes, Your Honor. Okay. Now, that is because if I'm the patient, my bloodstream is full of 6TG and perhaps other metabolites from the drug that I ingested in a pill that Dr. Lurie prescribed because I have a certain disease. Now, if toxicity starts at 400, then wouldn't that be true no matter what the disease was? No, Your Honor. From what I know, and I don't know the research well, people think that the thresholds may well be different for different diseases, and it may be that... Well, how can that be? If the metabolite at a certain concentration can begin to have toxic effects on my body and it's generally circulating in my entire vascular system, then how can it be that if I have one disease, it's toxic at one level and if I have a different disease, it's toxic at a different level? Your Honor, we may have underclaimed here and perhaps we could have written our patents broader. We did write them narrowly. They only cover certain diseases. They clearly don't cover others. Do you also find that the body's reaction to a certain drug may depend on its state of health? Well, it may well, Your Honor, and that's a level of science that is certainly beyond my kin. I will also say that the lower thresholds may well differ. You've got a lower threshold of 230 of 6TG, and that's for these particular diseases, and that threshold, again, could well differ. We have dependent claims, just so it's clear, on many of these particular diseases, so even if this court were to feel that independent claims were too broad, I do think that it would have to address the use of these drugs for particularly named diseases, and I do think that those are quite specific. Even if those claims were never adjudicated for purposes of claim construction or infringement. Well, Your Honor, let me put it this way. I think there's two different options. One is for this court to find that those are valid under 101, and the other is for this court to tell the district court that it could not properly have dismissed or judged those claims to be invalid. I don't think the third option of simply affirming that court without addressing it would be appropriate. Let me ask you, because a lot of the amicus friends of court briefs bring this up, there's tremendous concern, evidently, in your field that the Bilski test, the machine of transformation, may be too limited. All right? What would you suggest is perhaps a third prong, machine transformation and or what? Well, Your Honor, I'm the last to criticize this court for the test being too limited. Bilski itself said this may not be the final word, and in another case we may go somewhere else. I understand. And since I'm the visitor, I don't even have to make a complaint. They can say ignore what I said. My question can't even be taken as a thought of the court. Your Honor, I do think that there's one other prong you could look at, but I actually think it's built into machine of transformation. I do think machine is properly understood to include other types of statutory subject matter. And so if a tie to a machine in a way that sufficiently limits the scope of the claim is sufficient, then a tie to a composition of matter that sufficiently limits the scope of the claim can also be sufficient. Let's make an issue for the judges down there. Instead of saying how would you phrase it, machine or transformation, I mean machine and? I'd really call it statutory subject matter or transformation,  Or you could call it the tie or transformation test, because you're saying if there's a tie to any of the four or the other three of the four categories of patentable subject matter, that's sufficient. Well, but I think the tie has to be one, Your Honor, as you wrote in Bilski. I think it's got to be one that meaningfully limits the scope of the claim. You're saying if there's an adequate tie to a composition of matter, that satisfies the machine test, because in your view, machine meant to say machine or composition of matter or manufacture. Well, I won't put into the court's mind what the court meant. I would never do that. No, no, I'm asking what you're saying. But my interpretation of it, and particularly if you look at Comiskey, which the court reissued after Bilski, is that a tie can be not only to a machine but to other forms of statutory subject matter. But I hasten to add that that tie has to meaningfully limit the scope of the claims. And if it doesn't, then the tie is going to be insufficient. In other words, the involvement of the composition of matter must be to transform in the process. We're talking about a method. The method has to be transformative by means of the composition of matter. Well, that would certainly be enough to decide this case, Your Honor, in our favor. I do think that if you get into other biotech patents where you are searching within the body purely for existing compounds, for instance, genes and that sort of thing, and then testing those for diagnostic or treatment purposes, you'd either have to rely on the compound itself, or you'd have to rely on the transformation that is occasioned by the testing. I think the latter would be sufficient, by the way, as well. And I do think that while we don't have to go there in this case because we have additional steps and transformations, I do think that reliance, too heavy reliance, on a three-judge justice dissent in lab courts is not where I'd go, particularly where Justice Stevens, who was one of the three judges, disagreed with… Souter's not there anymore. Souter's not there anymore, and Justice Stevens, of course, disagreed with Deere to begin with and agrees with Fluke. All right. We've given you lots of extra time. Let's hear from Mr. Sandman. We'll restore five minutes for a bottle for you, Mr. Pierce. I appreciate that, Your Honor. You're welcome. Mr. Singer, good morning. Good morning, Your Honor. Can you help us out? I will try. That's all one can do. Maybe you can transform a lack of clarity into clarity. Clarity. That's what I will do. I'll try to clarify first the issue of the asserted claims, which was the subject of some debate. Did the district court simply suspend or invalidate the patent without considering the asserted claims? The asserted claims were identified by criminal defense and infringement contentions, and if I could pull the docket number really quickly, I would. But it's also discussed in the briefing before the court on summary judgment. I have an appendix that I pulled while Mr. Pierce was there. Well, roughly out of the 86 claims, how many were asserted? Fifteen. Fifteen. Fifteen. And there's sort of four groups of them. Those that related to IBD, the inflammatory bowel disease, or other gastrointestinal immune media disorders, and the patents list. Very many. So then in your view, the district judge invalidated 15 claims, not 86. That's correct. And we can identify what they are by looking at the briefing below. That's right. And the district court considered the only dependent claims that were argued, and the dependent claims that were argued and asserted related to those that add to the limitation of the measurement that was made on an HPLC. And the district court considered those in the context of Comiskey at, I don't have the precise page of his opinion, but it's appendix 40 and 41, where the district judge discusses the HPLC dependent claims. And those were the only dependent claims asserted in the case. So that's all that the district judge discussed, and I don't think it's fair to criticize. So out of the 15 asserted claims, how many were independent and how many were dependent? I'm going to say roughly half were independent, and the other half added HPLC done in red blood cells. That was the only dependent limitation, and that's what the district court discussed. I don't think it's fair to tag him with somehow doing something more than the parties proposed. Paul Mayo proposed that it move for the asserted claims to be invalid. Now, in this case, the Stage 1, there was summary judgment of infringement of one or two claims, right? That's correct. And then in Stage 2, there was a validity ruling. That's correct. But in your view, Stage 2 invalidated 15 claims. That's correct. Now, how can that be in the absence of a cross-claim? The claims were asserted, and the defense of validity was raised. So that the defense of validity, excuse me, the claims were asserted the way it works out in the Southern District of California. It's like a lot of districts, including the Eastern District of Texas, they've adopted a mechanism where you must judicially file infringement contentions. So you give notice to the defendants. What are you asserting? And therefore, what will I have to defend against? I think this has been a salutatory development. No, no, no. That's all perfectly clear. But it seems to me in this case, you went from the complaint that didn't identify claims, just identified two patents, to a later stage where you identified, not you, but where it was identified some 15 claims out of the total of 86 contained in the two patents. And then after that, we had a summary judgment ruling that one of those claims was infringed. And then after that, we had a validity ruling. So why isn't the validity ruling limited to the one claim found to have been infringed? There's a switch in the sequence. Actually, the infringement ruling came first. Yes. Before the claims had been asserted. Mayo had moved for non-infringement, summary judgment, on a host of the claims. Let me ask you a question, counsel. The judge grants summary judgment infringement on two claims. He's leaving open the other 13 perhaps for later. So they're still in play. And so you still want to defend against them on invalidity grounds because you don't want a jury trial, those other 13 being found against you. In fact, you don't even want them to go to trial. You can get them knocked out on invalidity. That's absolutely correct. So the first judgment of infringement on two didn't negate the other 13. They're still in play. Is that what you're saying? That is correct. And also, I mean, at the time, there were other motions pending for infringement of other claims. And so what the judge was doing was essentially taking on the asserted claims in the case that had been filed in the infringement contentions, and we were going to raise a validity defense at trial and taking our validity defense on summary judgment. Now, Mr. Singer, you went below a 101 on the basis that what happens in practicing this process is a natural process. But isn't it true that any time you administer a chemical material to the body, it acts by natural processes? I think that's true. You know, when you administer something to the body, the body's natural processes. And we have no question that treating a disease by administering a chemical, which we call a drug, operates by natural processes, but it's palpable. So wasn't that an incorrect round of decision? No. I don't agree that the first leads to the second because the claims at issue are not directed to that method of treating the patient. They're directed to the body. But when you administer the thiobomine-producing drug, doesn't it accomplish something in the body? Doesn't it treat? Doesn't it affect a transformation, which is a guilty test, in the body? In that very narrow context, it does. But the aim of the claim — Can we be? Isn't that the answer there, number 101, forgetting about 102 and 103? I disagree. I believe the transformation has to be — I think the words were something significant in the claims. And I think it's quite telling that in the 15 asserted claims, there's a group. You mean 100% of people have to get 100% well? I mean, if 10% of people get 10% well in cancer, that's grounds for having no drug approved. I think that's correct. So what's significant? Well, it's significant in the context of the real world that people administer drugs get better. But significant in terms of the claims as to what's actually being claimed. This is a — I hate to use it. It's been overused. But a data-gathering step. And it's telling. But don't we look at the actual steps rather than sort of the purpose? The actual steps do involve administering a drug, which is the same as treating a disease by administering a drug. And doesn't it accomplish the transformation? It accomplishes a transformation. I don't think it's the transformation envisioned by Bilski. I think Bilski did not. And Bilski made clear that the transformation has to be significant in the claims. And also didn't eliminate the notion of data-gathering steps in significant post-solution activities. I think you have to make a distinction between data-gathering that's nothing else and a step that gathers data and does something else. The phrase, if I recall correctly from Graham's, was merely data-gathering. Merely data-gathering. So here, when you administer the drug, it metabolizes into 6TG. And as I understand it, the 6TG both treats the disease and serves as a marker having to do with proper dosage. It's doing both things. So that step then seems to me can't fairly be described as merely gathering data. In the context of this claim, I think it's fair to call it a data-gathering step. How about the merely part? Whether it's merely or not, just thinking about it, in the context of an actual method of treatment, administering a drug is for treatment. Can't one claim a method of determining the level of hemoglobin? A method of determining hemoglobin, hematocrit, and quality? Isn't that data-gathering? Why isn't that 101 patentable? If it's a new way of determining the existence of a substance. Aha, now you're getting into novelty, which may be an issue here, but not before us now. Well, if it's something that preempts simply determining the existence of a substance in the body, there may very well be 101 issues. And I would hasten to add that the lack of importance of the administration step in these claims is indicated in the patent itself. What do you mean lack of importance? Nothing happens if you don't administer the drug. That starts the chain reaction here. Fair enough. But the method at issue here is to assess the metabolites, to assess the body's natural reaction to the drug, to assess the scientific observation made by the inventors. That's assessing the dosage. No, it's not. That was specifically excluded by the district court in the claim construction that is in dispute here. The dosage doesn't have to be adjusted. No, no, I didn't say it had to be adjusted. When you do this method, when you perform this method, you get an assessment of the accuracy or efficacy or safety of the dosage. You may or may not. I mean, the patents are quite clear that you may or may not get that assessment of the accuracy of the dosage. That it's within the doctor's discretion to look at it. No, no, no, come on. Step two in this claim gives you a number. That's correct. And the wherein clause says if the number falls between 230 and 400, you're fine, you're not toxic, and you are effective. If it falls below 230, you're not effective. If it falls above 400, you're dangerous. Now, it's true the doctor may consider other factors and not alter the dosage. But he's given information, significant information, by knowing the 6TG number that comes out of the asset. I agree it's significant information, and that's what this appeal is about, is whether or not a party can patent or a patentee can patent that information, that observation of a patient. That's not what he's patenting. He's patenting a series of steps that yield the number that has that significance. But in the context of these claims, it's patenting the information. There's simply no way to get at the information other than using the two steps. And by the way, the first step is optional. Oh, come on. Look, if there's some other way that somebody can give me the number, then it doesn't infringe. Because this claim requires that you get the number by administering the drug that turns into a particular metabolite that's then assayed. But there is no other way of getting the number. That's the essence of these claims. It's perhaps what you're arguing, and this is the question I ask counsel. It seems to claim any time you administer any drug of any kind, discovered, undiscovered, nothing that they had anything to do with, results in 6TG, and then measure it in any way with any test, nothing that they ever discovered, and come up with this natural number that may kill you, then that's what they patented. That's exactly what they patented. I would only add that there are claims in the patent that don't even require the administration. What you're saying is it's too broad under 112. No, I don't think that we're saying it's too broad under 112. There might be issues with the dermatological claims that are separate under 112. I mean, the studies in the patent relate to IBD, and we have claims on dermatology. That's a 112 issue. Did they go from one disease to the other unfairly? But the use simply of, even narrowly, of preempting the information is a one-on-one issue, and we believe, you know, based on the Supreme Court precedents, based on this Court's test in Pilski, that they have preempted the use of that biological object. Does this metabolite the only thing that these drugs metabolize into? They metabolize into two families of metabolites in the patent claims. That is what they metabolize into. That is the active agent. Is there something else that they might end up as? I don't believe so, but I would leave that to the scientists. I want to be sure I'm understanding you. You're saying, if I understand you correctly, that if I take the pill, that it has one of this, a member of this family of drugs specified in the claims, that it will metabolize into two substances. It's confusing. Not more than two. It's confusing because the TG, the thiablonine nucleotides that are mentioned in the patent, are actually a family of metabolites. Just to be accurate, there are multiple metabolites that are measured to get the measurement of thiablonine nucleotides. My question is whether there are any other, any non-6-TG metabolites produced by these drugs when ingested by a patient. There are other metabolites, methylmercaptocurine, 6-MMP-related metabolites that are also claimed in the patents in Sioux. And that is the metabolic pathway that is disclosed in the patents. Now tell me how information is preempted. Someone administers the drug, and then they do an analytical test, and they come out with information. And the information is sitting in a book, or it's published. But other people can use that. I'm putting copyright aside, but other people can use that. This test, procedures, doesn't preempt the information. It just preempts the steps of the method. It preempts the use of the information. How? Well, let's take Dr. Elazari, since it was raised. Dr. Elazari was a researcher at Mayo, and she is a physician. She was administering ethithioprine to her patients to treat an autoimmune skin disease. Oh, then the information wasn't preempted, but the administration and the diagnostic test, which is what the patent covers. Is there any other way of getting the information? I'm not aware of any other way of getting the information. And I don't think it's fair to say that she was preempted from administering the drug and then only then using the information. She was trying to do research to identify a new range of effective metabolites for her particular area. Are you saying all diagnostic methods preempt the result? No, this case does not go that far. This case is a very, I think, straightforward application of the Supreme Court's principles about preemption, about the inability of people to actually make use of this biologically observed correlation in any way. In telephone cases, the claims preempted the use of the signal. The cases talk about E equals mc squared. But the use of the conversion of matter and energy is truly patentable. Agreed, but the consideration of E equals mc squared is not. So it's a line-drawing exercise that we're engaged in. I think we all recognize that. And these claims, what animates these claims is the unpatentable natural correlation between the metabolites and disease. And there isn't anything more required to be done about the claims. I claim the correlation between thioguanine and IBD. That's a claim preempting the information, right? Yes. Which is different from a claim to administering and testing. I don't agree. I think they're, in words, they're different, and that would be engaged in the draftsman exercise. The two precede the correlation. Measuring the metabolites, administering the drug, that precedes the correlation. And again, I would hasten to add that if we're to look at other claims to see what did the inventors think was important, they have claims that don't require administering the drug. So that was another set of the assertive claims. Well, they may be dealt with differently. We may deal with them differently. Fair enough. And notice we're not talking about natural processes. Do you admit that one-on-one patentable processes involve natural processes, and that therefore the idea of a natural process cannot by itself be the ground by which you succeed here? I think claims involve natural processes, but they cannot claim them. And that's the distinction. When does a claim actually involve a natural process and rely on it as producing its end result? I claim the fact that drug X interacts with a receptor in the body to cause disease. That's a claim to a mechanism, to a natural process, which I guess we'd all consider is not one-on-one capable. I think we'd agree on that. But the method of using that drug, if new, obviously relies on that natural mechanism to function. I think we've exhausted the point. Just a couple other points. There was an extensive discussion about the preamble and whether it was limited or not. It was very clear in the record of the district court that the preamble was not considered limited. The claim chart submitted to- When you say considered, considered by whom? By the district judge. Yeah, but the question for purposes of a stop or a waiver wouldn't be what was in the mind of the district judge. It would be what did the party push on the district judge that he then accepted, which they now want to flip? Fair enough, and that's my bad for saying it incorrectly. They did push it on him, and it's in the- Where? What did they say and exactly where? It's in the- They say they didn't say that. You say you did say that. We have to look it up, so tell us what- I've got the claim charts and the infringement charts presented by Prometheus to the court, and I will give you a couple of sites. It's A13656 and A13777, which show an infringement chart, and they have the preamble, a method of optimizing or reducing toxicity, and then the interpretation is just a method. Oh, I saw that. I mentioned that in questioning Mr. Brest, but that's a little ambiguous. I don't think it is ambiguous, and the parties also think- I know you don't, and maybe we'll be persuaded, but you better assume we might not be persuaded, and then what? Where else is it nailed down that they're saying nothing else in the preamble has any significance at all, forget the rest of the words, they just don't count at all? Those are the two spots that we're relying on. In any event, we have the claim before us, right? The claim is what it is. It is what it is. We have a decision by a district court, and claim construction, we can review, right? Yes, you can. It's in your power, and I know it's rarely exercised when the parties were in agreement below, and of course, if they're arguably changing positions, so be it, but it's what we're relying on and what the district judge is relying on. In fact, in the infringement kind of context, it was relied on in order to try to prove infringement. There wasn't any attempt to try to show that anybody was, in fact, optimizing therapy or reducing toxicity, and I'll bring up Dr. Elizario again, and it may be a little bit of a rabbit hole, but it's important to show what the breadth of these claims do. Again, she was doing a research study. Well, what's the significance of that? I mean, this case doesn't involve a research exemption to infringement. That's not the issue here. Well, she was... So why do we care? You keep saying she was a research doctor, a research doctor, a research doctor, so what? Well, that's what claims to natural phenomena and the like and other unpatentable principles do. They stop research in its tracks, and that's the debate between the two sets of amici. On the one hand, the parties say we need patents. On the other hand, the parties say we don't because they'll stop innovation. They say it will need, it will improve innovation. Well, what about the whole concept of design around? If a patent creates exclusive rights for a certain technique, then the competitors look for another technique that will achieve the same goal. If they succeed, they design around, they get their own patent. Everybody gets a right to exclude, everybody makes money, and then the next guy tries to get around that, and you have generation after generation of progress, which is a good thing. That's a laudable goal, but it's not possible with respect to these patents. And in general, that's one of the animating principles behind barring claiming natural phenomena because people can't design around it. They can't design around a scientific fact that a certain level of metabolites is associated with toxicity and a certain level is associated... But this claim doesn't just claim the information, the correlation, let's call it, and nothing else. It claims a series of steps. And those steps are necessary to studying the correlation, and that's the essence of why the claim falls under 101. So is what you're saying that under 101, this is stopping anybody from administering any drug that results in the 6CG and the 6MD, and then evaluating correlations? That's correct. And that's what the claim is doing, and that's what the significance of Dr. Elazar is. Why do you say any drug? It's a drug that produces thioguanidine, which can't be lost. I don't believe it. It's any drug now developed in the future. In any event, that is purportedly the invention, right? No, the invention is not the drug. The purportedly invention, I think the inventors were quite clear, is that they discovered, they allegedly discovered this correlation. That was the invention, and that's what we have to assess. Wasn't the drug used before for IBD? Yes, it was. Then how did they discover a correlation? If the drug was used... I'm not here to say they did or didn't discover it. That's not before the court. They claimed to discover the correlation. That's what the essence of the patent is about. So you knock them out on 102 or 103, but you don't rule in the law on 101? Well, these claims raise the 101 issue. They fairly do. Did you plead a whole series of statutory defenses beyond 101? We pled 101, 102, 103, and 120. And the latter group were never taken up. It was resolved entirely on 101. They would have been taken up at trial. They were not yet taken up. But they're still lurking out there if the case goes back. That's correct. How do we get around this? In fact, the district judge, in his opinion, says that what Patente claims to have discovered is the correlation between the particular concentrations and either lack of efficacy or low end and toxicity. So if someone has done the research in this or any other area to find, oh, look, we can look at these metabolites and we can tell whether it's useless, not enough, or dangerous, too much, isn't that an advance, however you put it, whatever phrase you use, of technological knowledge that the patent system is intended, now I'm going back to the burial cases, that the patent system is intended to protect this advance of knowledge? If that's what they claim to have discovered was the correlation, and I think I heard you just say that, too, then why shouldn't that be given patent protection? Well, not every advance gets patent protection. I know that's a counterintuitive principle in this day and age where we are used to patenting lots of things, but there are basic scientific facts, no matter how hard it might have been to discover and no matter how worthy of praise that we are not allowed to claim. But you keep going back to implying that we should ignore that this claim requires a certain type of drug to be administered, so that other drugs are not covered by this claim, other drugs are not preempted, only those drugs that produce, as a metabolite, 6TG, that's all that's covered by this claim. I'm not asking you to ignore it. These are all the drugs that produce the correlation. That is what is claimed. There is no other way. You talked about design realm, Chief Judge. There's no way to design realm. How do we know that? How do we know there's no other way to tell whether the dosage is too high or too low? With respect to metabolites, there simply isn't. The claims cover the administration of any drug that yields the metabolites, then measuring the metabolites, and then considering the correlation in the context of showing toxicity or efficacy. There isn't any way to design realm. You seem to be assuming that the only way to treat this class of diseases is with these known drugs. I'm imagining somebody may come up with therapies based on other drugs that produce other metabolites, in which case there would be no basis of alleging infringement. They'd be perfectly free to do that because this claim is limited to these drugs. I understand that. That would be a different case. If we had a different drug being used to treat these diseases, that would be... But you're assuming that no other drug ever could be discovered that could treat these diseases and that therefore all treatments of these diseases are going to fall under this patent. No, I don't think that's what I'm assuming. I'm simply assuming that this patent covers all drugs, whether now known or in the future discovered, that will produce these metabolites, which will be produced by the buy. That's what the assumption of the claims is, and that's what the scope of the claim is. To take the chief judge's question more simply, perhaps, what happens if someone says, okay, I made a study of the administration of these drugs that produce the 6TG, and I found down to the half pound, say, there's a correlation between body weight and toxicity. And so now doctors will know, they just go to the patient on the scales, they take a look at how much it is, and don't give them any more than that because it's going to be toxic. That's a very simplistic, obviously, way of determining toxicity or efficacy, but many drugs are given by body weight. Is this claim really precluding all possibilities of determining toxicity or lack of efficacy? Given the parameters you're hypothesizing, I don't think this claim prohibits that. Considering body weight is different. Well, I'm giving you the very simple one, but what about, I mean, aren't there possibilities of other more sophisticated that I can come up with that don't necessarily involve measurement of 6TG and 6MP, but involve other things like body weight or... Judge Clark, I think there possibly are. I mean, I'm sitting here, I don't know the answer to that question. But nonetheless, when we look back at these claims with respect to what they are relying on, it's the consideration of the metabolites produced by the bot and an observation made by the scientists and, frankly, a statistical association that they made from observations that there were certain levels that were in the large associated with toxicity and efficacy. And no one can then look at those numbers, which anybody can observe and have been observed in the past, and make that association themselves. And so it's an issue not of a new method of treatment, but it's a method of assessing metabolite levels in the bot. That's what's really claimed at the end of the day. In your brief, I thought you complained about the fact that the claims don't require the physician to actually do anything with the correlation and the readout on what the number is and whether it falls between 230 and 400 or not. What if it did? What if the claims said... ...it's being treated with a continuous drip? And so the question is modulating the quantity of drug administered through the drip per minute. So that's the dosage equivalent. Now, if this claim had completed the loop and required a machine to change the drip in order to boost the dosage when it was too low or slow it down when it was too fast, then would that make this okay under 101 in your view? That's the much harder question, and I think that's the right way to look at it. I think if this claim required the doctor to subsequently treat the patient in a new way in connection with using the metabolite levels, then the 101 issue is probably surmountable. I think it would depend still on the nature of that additional step. The way you've described it with the machine modulating doses, particularly in the IV setting, is a very specific way. But that additional step by the doctor, that is a new method of treatment. Now we've crossed the hurdle from researching and coming close to something new or learning a scientific fact to using that scientific fact to develop a new treatment. Because what, the machine that squeezes the tube on the drip or releases the squeeze? That machine, which is probably already easily known and could be easily designed even by me, that's the magic additional ingredient that makes it okay under 101 when it's otherwise not? It certainly brings it much closer. You would have to still make the assessment that the Supreme Court made in Funk Brothers as to whether or not you're still preempting the natural phenomenon. But this claim doesn't get there. So you don't even have to make that inquiry. Why isn't this claim smart? If, as a physician, I need to know not only do I have a risk of toxicity or ineffectiveness at the high end or the low end, but if there are other factors. For example, if the patient is so ill they're going to die if they don't get a stronger dose, you might give them the stronger dose even if it's way over 400. So we don't want physicians to be dumb and do robots and have to change the dose just because the readout says the number is 403. You want the physician to be smart and say, all right, it's over 400. That's kind of a warning area. I've got to watch it. But this patient is so ill that the risk is greater if I don't let it stay over 400. He's going to just die. So why wouldn't we make it... It's okay under 101 if it's all automatic and the physician has to be a robot, but if the physician uses good judgment and weighs many factors, one of which is this number, that's not okay under 101. That doesn't seem like a sensible regime. Well, I disagree. I think it is a sensible regime because that's the basic scientific fact that you're now saying by having this claim that the physician cannot consider absent gang royalty to Prometheus. And basic scientific facts, natural phenomenon, those kinds of things, those are the things we build future treatments on. We might build that machine that you talked about based on knowing this scientific relationship and natural phenomenon. That's the improvement the Patent Act is aimed at. That's what we allow patents for, for new things like that, not simply for discovering something that's nature's handiwork, as the Supreme Court has made clear. That's the difference that I see. Are you saying that if you build something, it's patentable, but if you merely discover something that preexisted, it's never patentable? If you can make use, in a concrete way, of that new discovery, it can be patentable. I think the Supreme Court has said there's no invention or discovery, excuse me, no patent, in the discovery of one of nature's secrets, but in the practical application thereof. And so the question for claims like this is on which side of that line do they fall? Do they fall on the Funk Brothers side of the line, where the claim is simply preempting the natural phenomenon from any practical use by anybody? Funk Brothers was a composition claim for old materials, the discovery being the interaction or lack of interaction. That's quite different. That's different, but also demonstrates the point. The inquiry still has to be made, Chief Judge Michel, on whether or not the additional steps that you might add. We still have to make the inquiry of whether or not the claim satisfied the hurdle of 101. But it's certainly far closer than the claims we have asserted in this case. It seems to me you're saying that the Patent Act shouldn't prevent a doctor from using this basic information, i.e., the correlation. But does it make a difference whether it's preventing doctors from using this information, without paying royalty, in just this narrow class of gastrointestinal diseases, or in all possible forms of medical treatment? Is there a difference there? I don't know that there really is, in connection with this issue. I think the flute case talks about, and Bill Steeve follows it up, that a field-of-use limitation on something that is otherwise non-patentable doesn't change things. Are you saying that the preamble and all the steps in these patents are merely a field-of-use indication? I think at best, below the parties agreed they weren't a limitation, at best they're a statement of intended use, is what I think they are. That's how I would characterize them at best. Nothing but a field-of-use indicator. I think that's right. I think that's what they are. They talk about doing this in a particular disease setting, and then they have other claims that talk about doing it in a different disease setting. They're fields-of-use, and that's what they are. I would submit that below, they were considered as having no meaning. That's what the parties agreed to. But in terms of, if the court is going to use its prerogative to change the construction of the preamble, beyond what was actually agreed to below, then that is, at best, a statement of intended use. And I would think that a statement of intended use for otherwise unpatentable subject matter does not meet the tests outlined in Bilski and in the Supreme Court's precedent about limiting the use of these things. Absence, I've gone way over my time, and I know the Court has been very beneficial. Absent any other questions, I don't know that I have anything more to say. Thank you, Mr. Bress. Mr. O'Rourke, you have five minutes. I'd like to start, Your Honor, by apologizing for any confusion that we may have caused with respect to what claims are at issue. And I'd like to offer up, and I haven't asked my brother here, but I'd like to offer up a joint letter from the parties clarifying for this Court what claims were at issue today. And if there's any disagreement in there, we'll note that it won't be a briefing, an argumentative briefing. Yeah, that might be useful. There's certainly no harm in it. If we could have that within ten days, that would be helpful. I'll endeavor to do that. All right, go ahead. Secondly, I guess I'd like to note that the claims here are ones that, by their very nature, are only used for treatment. And I just think that it's hard for us to... We can argue hypothetically about the preambles, but when you're talking about administering drugs that are toxic drugs to people with serious diseases, you're doing it to treat them.